1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RAUL ENRIQUE RAMIREZ,                         No.  2:14-cv-2079 GEB KJN P

12                      Plaintiff,

13          v.                                      FINDINGS AND RECOMMENDATIONS

14   GARY HAFFNER, et al.,

15                      Defendants.

16

17          Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking relief under

18   42 U.S.C. § 1983.  Pending before the court are motions for summary judgment brought pursuant

19   to Rule 56 of the Federal Rules of Civil Procedure filed by defendant Thomas on October 3,

20   2016, and defendants Surian, Guerra, and Wilson[1] on October 11, 2016.  Plaintiff filed

21   oppositions to the motions, and defendants filed replies.  As set forth below, the undersigned

22   recommends that the motions be partially granted.

23                                      **BACKGROUND**

24          Plaintiff proceeds on his original complaint based on his Eighth Amendment claims

25   against defendants Thomas, Surian, Fleming, Guerra and Wilson.

26   ////

27   _____

28   [1]  Defendant Fleming does not move for summary judgment.  Thus, plaintiff's arguments
     concerning defendant Fleming are not addressed herein.  (ECF No. 72 at 51, 52-57.)

                                              1

I. <u>Allegations of the Complaint</u>

Pursuant to the instant complaint, plaintiff contends that he was denied constitutionally adequate medical care concerning the diagnosis and treatment of a liver mass, including his related pain symptoms. Plaintiff states that he began experiencing liver pain in 2007, when he was housed at Calipatria State Prison (Calipatria). Initial tests were positive for Hepatitis C and Hepatitis B, but subsequent tests were negative. Plaintiff alleges that defendant S. Thomas, a Family Nurse Practitioner (FNP) at Calipatria, prescribed Tylenol (which plaintiff alleges is contraindicated for liver disease and may cause further injury), and failed to inform plaintiff that his subsequent tests were negative, thus delaying diagnosis and treatment of plaintiff's liver mass.

On January 13, 2009, plaintiff was admitted to an outside hospital for emergency treatment of a collapsed lung. A CT scan revealed plaintiff's liver mass; the attending physician informed plaintiff that this was "serious stuff" requiring further evaluation, and so informed prison medical staff. On February 4, 2009, an unnamed Calipatria physician ordered a follow-up CT scan of plaintiff's liver within six months. However, on June 17, 2009, plaintiff was transferred to High Desert State Prison (HDSP).

The admitting nurse at HDSP indicated that plaintiff needed a follow-up CT scan and should be seen by a physician within 30 days. Plaintiff appears to allege that he was not seen by a physician until eight months later, after he was moved to administrative segregation and then the Secure Housing Unit (SHU) as a validated prison gang associate. Plaintiff alleges that throughout this period he made repeated requests for medical care, in which he noted his continuing and significant pain symptoms.

On March 3, 2010, plaintiff was seen by HDSP physician Dr. Gary Haffner, who, *inter alia*, ordered an MRI of plaintiff's liver, which was taken on March 17, 2010. Dr. Haffner reported the MRI results to plaintiff, noting that he had a "large tumor," and discussed the "next course of treatment." (Comp. at 5.)

On April 21, 2010, plaintiff was examined by an unnamed physician for complaints of significant liver pain. The physician submitted requests for a GI evaluation and for follow-up of plaintiff's hepatic hemangioma (benign liver mass). The physician reportedly told plaintiff that

he should stop taking Tylenol because it was damaging his liver.  The next day, on April 22, 2010, this physician's request for services was denied at the Unit Management level by defendant R. Surian, R.N.

Plaintiff alleges that, between April and June 2010, he attempted to submit multiple requests for health care services, due to severe liver pain, but never obtained a medical appointment.  Plaintiff alleges that defendant Correctional Officer and Institutional Gang Investigator B. Fleming intercepted and trashed plaintiff's health care requests, as well as plaintiff's outside and institutional mail, inmate grievances, etc.

On June 18, 2010, plaintiff was transferred to the Transitional Housing Unit (THU) within HDSP, reportedly for the purpose of debriefing.  Plaintiff alleges that, despite his complaints of severe pain, he was denied all medical care, until January 2011, by defendant Fleming, and other nonparties.  Plaintiff alleges that defendant Fleming and others told plaintiff that he would have no access to medical care unless he debriefed.

On an unspecified date, plaintiff was transferred to the SHU at the California Correctional Institute (CCI), which is his present place of incarceration.  Plaintiff states that CCI physician Dr. M. Garikaparthi provided plaintiff with appropriate care.  An MRI taken June 25, 2013, showed that plaintiff's liver mass had grown.  On August 23, 2013, plaintiff was seen by defendant Dr. M.V. Vu for review of the MRI results.  Dr. Vu reportedly told plaintiff that he had a very serious condition and that a rupture of the mass would be "very bad for you."  Dr. Vu submitted a request for surgical evaluation.  On September 10, 2013, plaintiff participated in a telemed conference with defendant Dr. Michel A. Michael, apparently an outside medical expert.  Dr. Michael recommended against surgical excision because it would leave a huge scar and, reportedly, because plaintiff was a "lifer."  On September 30, 2013, plaintiff was told by CCI physician Dr. K. Hill that she did not know why surgery was denied.  On October 2, 2013, plaintiff was again seen by defendant Dr. Vu, who told plaintiff that he had been referred for gallstone surgery, but not for excision of his liver tumor.

Plaintiff sought urgent medical care on October 22, 2013, for a severe pain episode.  The following day, defendant I. Guerra, R.N. refused to see plaintiff unless he paid $5.00, which is

generally not required for urgent care; plaintiff asserts that he did not receive needed medical care.

On February 2, 2014, plaintiff was informed that he'd been approved to see a specialist at the University of Southern California, but the appointment never took place. On March 26, 2014, plaintiff obtained a CT scan, showing that his liver mass had grown still larger. This finding was confirmed by an April 16, 2014 MRI. On May 6, 2014, plaintiff was seen by a specialist who recommended a liver embolization (occlusion of blood vessels to the liver) rather than excision, due to high risks associated with excision. Plaintiff agreed to the procedure, with the goal of reducing his pain.

On July 23, 2014, plaintiff underwent a liver embolization. Attending radiologist Dr. Omar Saleh reportedly expressed surprise to plaintiff that he had been taking Tylenol 3 for the last ten to eleven months, three times daily, because it was "very bad" for plaintiff's condition. Plaintiff states that he told Dr. Saleh that when his gall bladder was removed (date not provided but, inferentially, sometime between October 2013 and July 2014), he also had a liver biopsy that showed his "entire liver was covered with whitish abnormal lesions which could be the result of acetaminophen and excessive amounts thereof." (Comp. (ECF No. 1 at 10.) Dr. Saleh recommended an alternate pain medication.

On August 5, 2014, plaintiff was taken off all pain medications, resulting in bouts of pain, "some much stronger than before." (Id. at 11.) On August 6, 2014, defendant I. Guerra, R.N., reportedly accused plaintiff of inappropriately seeking narcotics, and defendant Dr. R. Wilson, refused to see plaintiff, resulting in plaintiff receiving no pain medications. Plaintiff reportedly submitted several health care services request forms, most of which were allegedly ignored. Plaintiff also filed at least one relevant administrative grievance. On August 26, 2014, defendant Dr. Wilson interviewed plaintiff concerning his grievance. Dr. Wilson reportedly informed plaintiff that the liver embolization should have eliminated plaintiff's pain, and denied plaintiff any pain treatment.

Plaintiff contends generally that defendants have been deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment's proscription against cruel or

unusual punishment.  Plaintiff alleges that he has exhausted his administrative remedies.  Plaintiff seeks declaratory relief; compensatory and punitive damages; and injunctive relief requiring that defendants provide adequate medical care and pain management.

II. <u>Screening</u>

At screening, the court found that the allegations of the complaint state potential Eighth Amendment claims for deliberate indifference to serious medical needs against the following defendants: (1) S. Thomas (Calipatria FNP) who allegedly, in 2007, prescribed Tylenol to plaintiff despite its contraindication for liver disease, and failed to inform plaintiff that he tested negative for hepatitis, thus delaying the discovery and treatment of plaintiff's liver mass; (2) R. Surian, R.N. (HDSP nurse), for allegedly denying an April 2010 physician request for services that would provide plaintiff with GI and Liver evaluations (which then were apparently delayed until 2013 or 2014); (3) B. Fleming (HDSP Correctional Officer and Institutional Gang Investigator), for allegedly interfering with plaintiff's right to receive constitutionally adequate medical care, by allegedly intercepting and destroying plaintiff's requests for health care services, and allegedly denying plaintiff medical treatment unless he debriefed; (4) I. Guerra, R.N. (CCI nurse), for allegedly refusing to see plaintiff on an urgent basis in October 2013, and for allegedly refusing to provide plaintiff with pain medication in August 2014; and (5) Dr. R. Wilson (CCI physician), for allegedly refusing to provide plaintiff with pain medication in August 2014.  (ECF No. 7 at 8-9.)

The court found that plaintiff failed to state cognizable Eighth Amendment claims against defendants Vu, Haffner, McDonald, David, Holland and Beard, and dismissed those claims with leave to amend.  (ECF No. 7 at 9-10.)  Similarly, plaintiff's First Amendment and due process claims were dismissed without leave to amend.[2]  (ECF No. 7 at 13.)  On October 31, 2014, plaintiff opted not to file an amended complaint, and consented to the dismissal, without prejudice, of defendants Vu, Haffner, McDonald, Davie, Holland, and Beard, and all "Doe" defendants.  (ECF No. 10 at 1.)

---

[2]  Plaintiff asserted his validation as a gang associate was invalid in a separate action, <u>Ramirez v. Fleming</u>, Case No. 2:14-cv-1937 KJM CKD P (E.D. Cal.).

The court ordered service of the complaint on defendants Thomas, Surian, Fleming, Guerra and Wilson; defendants filed answers to the complaint. (ECF Nos. 27, 36.)

III. <u>Motions for Summary Judgment</u>

On October 3, 2016, defendant Thomas filed the pending motion for summary judgment on the grounds that: (1) no dispute exists as to any material fact, and plaintiff cannot show as a matter of law that she was deliberately indifferent to plaintiff's serious medical needs; (2) plaintiff failed to exhaust his administrative remedies; and (3) plaintiff's claim is barred under the Eleventh Amendment and qualified immunity grounds. (ECF No. 62.) On October 11, 2016, defendants Surian, Guerra and Wilson filed a motion for summary judgment on the grounds that there is no genuine dispute as to any material fact. (ECF No. 63.)

Following extensions of time, plaintiff filed an amended opposition to defendant Thomas' motion on January 11, 2017 (ECF No. 73), and filed his opposition to the second motion for summary judgment on January 10, 2017 (ECF No. 72). On March 13, 2017, pursuant to court order, plaintiff clarified the exhibits upon which he relied to support his opposition to defendant Thomas' motion. (ECF No. 82.) On March 22, 2017, defendant Thomas filed her reply to the amended opposition. (ECF No. 83.) On February 13, 2017, defendants Surian, Guerra and Wilson filed their reply to plaintiff's opposition. (ECF No. 79.)

**SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)). "Where the nonmoving party bears the burden of proof at trial, the moving party need

only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587; Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

By contemporaneous notice provided on October 3, 2016, and October 11, 2016 (ECF Nos. 62, 63-2), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

**OTHER APPLICABLE LEGAL STANDARDS**

I. Civil Rights Act Pursuant to 42 U.S.C. § 1983

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute requires that there be an actual connection or link between the

actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

(1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or

omits to perform an act which he is legally required to do that causes the deprivation of which

complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

Moreover, supervisory personnel are generally not liable under § 1983 for the actions of

their employees under a theory of respondeat superior and, therefore, when a named defendant

holds a supervisorial position, the causal link between him and the claimed constitutional

violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979);

Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory allegations

concerning the involvement of official personnel in civil rights violations are not sufficient.  See

Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

II.  The Eighth Amendment

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S.

Const. amend. VIII.  The unnecessary and wanton infliction of pain constitutes cruel and unusual

punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986);

Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

Neither accident nor negligence constitutes cruel and unusual punishment, as "[i]t is obduracy

and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited

by the Cruel and Unusual Punishments Clause."  Whitley, 475 U.S. at 319.

What is needed to show unnecessary and wanton infliction of pain "varies according to

the nature of the alleged constitutional violation."  Hudson v. McMillian, 503 U.S. 1, 5 (1992)

(citing Whitley, 475 U.S. at 320).  In order to prevail on a claim of cruel and unusual punishment,

however, a prisoner must allege and prove that objectively he suffered a sufficiently serious

deprivation and that subjectively prison officials acted with deliberate indifference in allowing or

causing the deprivation to occur.  Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).

////

A. <u>Inadequate Medical Care</u>

If a prisoner's Eighth Amendment claim arises in the context of medical care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." <u>Estelle</u>, 429 U.S. at 106. An Eighth Amendment medical claim has two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059 (9th Cir. 1991), <u>overruled on other grounds by</u> <u>WMX Techs., Inc. v. Miller</u>, 104 F.3d 1133 (9th Cir. 1997) (en banc). Specifically, plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent." <u>Wilhelm v. Rotman</u>, 680 F.3d 1113, 1122 (9th Cir. 2012) (citing <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006)).

A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" <u>McGuckin</u>, 974 F.2d at 1059 (quoting <u>Estelle</u>, 429 U.S. at 104). Indications of a serious medical need include "the presence of a medical condition that significantly affects an individual's daily activities." <u>Id.</u> at 1059-60. By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994).

If a prisoner establishes the existence of a serious medical need, he must then show that prison officials responded to the serious medical need with deliberate indifference. <u>See</u> <u>Farmer</u>, 511 U.S. at 834. In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison officials provide medical care. <u>Hutchinson v. United States</u>, 838 F.2d 390, 393-94 (9th Cir. 1988). Specifically, deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." <u>Wilhelm</u>, 680 F.3d at 1122 (citing <u>Jett</u>, 439 F.3d at 1096). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. <u>Snow v. McDaniel</u>,

681 F.3d 978, 985 (9th Cir. 2012) (citation and quotation marks omitted); <u>Wilhelm</u>, 680 F.3d at 1122.

Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." <u>Broughton v. Cutter Laboratories</u>, 622 F.2d 458, 460 (9th Cir. 1980) (citing <u>Estelle</u>, 429 U.S. at 105-06). <u>See also</u> <u>Toguchi v. Soon Hwang Chung</u>, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."); <u>McGuckin</u>, 974 F.2d at 1059 (same). Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" <u>Farmer</u>, 511 U.S. at 835.

Delays in providing medical care may manifest deliberate indifference. <u>Estelle</u>, 429 U.S. at 104-05. To establish a claim of deliberate indifference arising from delay in providing care, a plaintiff must show that the delay was harmful. <u>McGuckin</u>, 974 F.2d at 1059. In this regard, "[a] prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." <u>Jett</u>, 439 F.3d at 1096.

Finally, mere differences of opinion between a prisoner and prison medical staff or between medical professionals as to the proper course of treatment for a medical condition do not give rise to a § 1983 claim. <u>See</u> <u>Snow</u>, 681 F.3d at 988; <u>Toguchi</u>, 391 F.3d at 1058; <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332 (9th Cir. 1996).

**STATEMENT OF UNDISPUTED FACTS**

All moving defendants filed a statement of undisputed facts as required by Local Rule 260(a). Plaintiff's oppositions to the pending motions for summary judgment technically fail to comply with Local Rule 260(b). Rule 260(b) requires that a party opposing a motion for summary judgment "shall reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer,

admission, or other document relied upon in support of that denial." Id.  The moving defendants

ask the court to grant their motions because plaintiff failed to reproduce their itemized facts and

clearly admit those facts that are undisputed and deny those facts that are undisputed.  Plaintiff

included his own statement of undisputed facts within his oppositions, but did not reproduce the

itemized facts from defendants' statements.

In light of plaintiff's pro se status, the court has reviewed plaintiff's filings in an effort to

discern whether any of these disputes involve genuine issues. A review of plaintiff's filings and

of the evidence provided by the parties, establishes the following material facts which are not

subject to genuine dispute, unless otherwise indicated.[3]

Plaintiff is an inmate in the custody of the California Department of Corrections and

Rehabilitation ("CDCR").

Defendant Thomas

1.  Plaintiff Raul E. Ramirez is a prisoner in the custody of the CDCR.

2.  Defendant Seleaina Thomas is a Nurse Practitioner employed at Calipatria State Prison

(Calipatria) in 2007.

3.  While incarcerated at Calipatria, plaintiff filed a Health Care Services Request Form

(also known as a sick call request) on June 26, 2007, asking, among other things, to be tested for

Hepatitis.[4]  (ECF No. 63-3 at ¶ 4, Ex. A (at 7).)

4.  In the June 26, 2007 request, plaintiff did not mention he was suffering any type of

abdominal or liver pain.  Rather, plaintiff's request states:

> I am requesting a refill of sunscreen SPF 30 24 OML -- as well as
> I'd like to be seen concerning my allergy medication ASAP.  And
> whatever happened with my cholesterol test and Hep-C/HIV?

(ECF No. 62-3 at 7.)

5.  In response to plaintiff's request, on or about July 3, 2007, he was examined by a

---

[3]  Documents submitted as exhibits are considered to the extent that they are relevant, and despite the fact that they are not authenticated because such documents could be admissible at trial if authenticated.

[4]  Plaintiff previously tested negative for the Hepatitis C virus ("HCV") in 2004.  (Pl.'s Dep. at 78:17-24.)

12

nonparty nurse who charted plaintiff's complaints as "I need . . . sunscreen. I never got tested for HIV/Hep. My allergies are bad. I need something."[5] (ECF No. 62-3 at 7.) The treatment plan was charted as plaintiff "wants HIV and HEP [Hepatitis] test." (Id.)

6. On July 3, 2007, defendant Thomas ordered a Hepatitis panel to determine if plaintiff was Hepatitis A ("HAV"), B ("HBV"), or C "(HCV") positive. (ECF No. 62-3 at ¶ 6 & 15; Pl. Dep. 18:1-25.)

7. Plaintiff's blood was drawn on July 18, 2007. (ECF No. 62-3 at 18; Pl. Dep. 88:6-10.)

8. Plaintiff tested negative for HAV and positive for HBV and HCV. (ECF No. 62-3 at 18; Pl. Dep. 88:6-10.)

9. On August 31, 2007, Thomas physically examined plaintiff. (ECF No. 62-3 at ¶¶ 8 & 21, 24, 27).)

10. During the examination, Thomas completed an HCV Clinical Evaluation Form and her Physician's Orders. (ECF No. 62-3 at ¶¶ 8 & 24, 27.)

11. Defendant Thomas noted that the purpose of plaintiff's visit was for seasonal allergies and a request for sunscreen. (ECF No. 62-3 at ¶ 8 & 24).) She also noted that plaintiff had a "mild scar" on his right arm from a prior burn. (Id.)

12. Thomas noted that plaintiff was HBC immune (since he had developed antibodies to both HBV and HCV as a result of his prior exposure to the viruses) and that he should be vaccinated for HAV and seen in the clinic for follow up on a monthly basis. (ECF No. 62-3 at ¶¶ 8 & 24; Pl. Dep. 20:5-9.)

13. As part of this examination, Thomas asked plaintiff a host of medical questions. (ECF No. 62-3 at ¶¶ 8 & 24.)

14. Thomas marked the box "normal" by "abdomen" on the evaluation form.[6] (ECF No.

---

[5] The nurse did not chart that plaintiff was having abdominal or liver pain. (ECF No. 62-3 at 7.)

[6] Defendant Thomas declares that as part of her physical exam, she asked plaintiff whether he was experiencing any abdominal pain, and noted that he responded "no." (ECF No. 63-3 ¶ 7.) Also, Thomas declares that if plaintiff indicated that he had been experiencing abdominal or liver pain, then Thomas would have charted that information in the normal course of her examination. (Id.) Plaintiff declares that he requested HCV treatment due to his pain symptoms, which he

1   62-3 at ¶ 8 & 24.)

2          15.   Thomas informed plaintiff that he had tested positive for both HBV and HCV.  (ECF

3   No. 62-3 at ¶¶ 8 & 21, 24; Pl. Dep. 18:16-25; 88:9-10; 89:2-6; ECF No. 72 at 76.)

4          16.   During the August 31, 2007 appointment, Thomas ordered further testing to monitor

5   Ramirez's overall health, to decide if drug therapy was appropriate under CDCR guidelines for

6   the treatment of HCV, and to determine how well plaintiff's liver was functioning.  (ECF No. 62-

7   3 at  ¶¶ 8, & 24, 27); Pl. Dep. 20:18.)

8          17.   These tests included one for HCV RNA to determine if HCV was active and if

9   plaintiff was chronically infected with HCV.  (Id.)

10          18.   Plaintiff's blood was drawn for these tests in mid-September 2007.  (Pl. Dep. 92:6-25;

11   ECF No. 62-3 at 30.)

12          19.   The nonprison lab results note that plaintiff's blood was drawn on September 12,

13   2007.  (ECF No. 62-3 at 30-35; 72 at 77.)  Some lab results were reported on September 14, 2007.

14   (ECF No. 62-3 at 31-35.)  The HCV RNA test results were reported on September 19, 2007.

15   (ECF No. 62-3 at 30.)

16          20.   Thomas reviewed plaintiff's test results in mid-September.  (ECF No. 62-3 at  ¶¶ 9 &

17   3, 30-35.)

18          21.   The lab results indicated that plaintiff's liver enzymes were in the "normal range"

19   and, thus, he would not be eligible for HCV treatment under CDCR's California Correctional

20   Health Care Services ("CCHCS") Guide for Hepatitis C.  (ECF No. 62-3 at  ¶¶ 9, 10 & 39-55.)

21          22.   The lab results also indicated that HCV RNA was "not detected," which meant that

22

23   claims he previously reported to an unnamed MTA.  (ECF No. 72 at 76.)  Plaintiff also declares
    that defendant Thomas instructed plaintiff to ask her MTA's for Tylenol whenever he ran out.
24   (ECF No. 72 at 76-77.)  Plaintiff declares that in 2007 it was common practice for MTA's to
    freely hand out aspirin or Tylenol upon request.  (ECF No. 72 at 77.)  In his deposition, plaintiff
25   claimed when he first saw defendant Thomas his pain "went from maybe a 4 up to 7, . . . and then
    up to 8."  (Pl.'s Dep. at 86.)  Plaintiff testified that defendant Thomas told plaintiff to ask the
26   MTA's for Tylenol.  (Pl.'s Dep. at 87.)  But plaintiff denied asking defendant Thomas for pain
    medication every time he saw her:  "I told her I was in pain and I wanted to get on interferon."
27   (Pl.'s Dep. at 95.)  In addition, plaintiff denied asking defendant Thomas for stronger pain
    medication because he wanted to be put on treatment for HCV.  (Pl.'s Dep. at 101.)

28

plaintiff's HCV viral load was so low at the time of this test that it was not present at the level necessary to conclude that he was chronically infected. (ECF No. 62-3 at ¶¶ 9 & 30-35.)[7]

23. A finding that HCV RNA was undetectable in plaintiff's blood on September 12, 2007, did not mean he was Hepatitis C negative, and those test results do not say otherwise. (ECF No. 62-3 at ¶ 9.)

24. The positive test result from July 2007 merely indicated that plaintiff had been exposed to HCV at some point and developed antibodies. (ECF No. 62-3 at ¶ 9.) The fact that a subsequent test confirmed that he did not appear to be chronically infected with HCV did not mean that plaintiff was HCV negative in September 2007. (Id.)

25. Defendant Thomas completed a Notification of Diagnostic Test Results in September of 2007.[8] (ECF No. 62-3 at ¶¶ 10 & 38.) The notification states that plaintiff's "test results are essentially within normal limits or are unchanged and no physician follow up is required." (ECF No. 62-3 at 38.) The "normal limits" was circled. (Id.)

26. Defendant Thomas did not see plaintiff in the medical clinic for any medical issue after September 2007.[9] (ECF No. 62-3 at ¶ 13; Pl. Dep. 21:25-22:4; 90:13-14; 100:24-101:1.)

---

[7] Defendant Thomas states that during plaintiff's deposition, plaintiff testified that the only documents he had supporting his claims against Thomas were "the lab orders that she ordered for hepatitis and the results. Further labs, further results. I think I may have one more document with her name on it . . . ." (ECF No. 62-2 at 4 n.3.) However, defendant did not provide a citation for the alleged deposition testimony.

[8] In the statement of undisputed facts, defendant claims the notification was sent to plaintiff on September 18, 2007. (ECF No. 62-2 at ¶ 23.) But in her declaration, Thomas declares she sent the notification on September 12, 2007. (ECF No. 63-3 at ¶ 10.) The notification form does not provide a blank for a date the notification is sent. (ECF No. 62-3 at 38.) Rather, the form provides for the date of the test, and is then separately stamped "received" on September 18, 2007, but the separate stamp of Thomas blocks out the first portion of "[illegible] Facility Medical" under the received stamp. (ECF No. 62-3 at 38.) Moreover, the Foundation Lab report reflects that the HCV RNA results were not reported until September 19, 2007. (ECF No. 62-3 at 30.) Plaintiff claims that defendant Thomas failed to inform plaintiff of the not-detected HCV DNA test results. (ECF No. 72 at 77.)

[9] Thomas declares that she did not speak to plaintiff again after September 2007, and that her review of plaintiff's medical records from 2007 to 2009 confirmed that she did not have any additional communication with plaintiff after Thomas sent the notification of test results in September of 2007. (ECF No. 62-3 at 3 (¶ 13).) In his deposition, plaintiff claims he saw

27. Per Thomas' August 31, 2007 orders, plaintiff should have been seen for follow-up care on or before September 31, 2007.[10] (ECF No. 62-3 at ¶¶ 11 & 27).) This did not happen. (Id.)

28. Defendant Thomas submitted two refusal to treat forms in plaintiff's medical records, but plaintiff denies refusing any follow up exam with defendant Thomas or any other health care provider in connection with his hepatitis diagnosis.[11]

29. On October 18, 2007, plaintiff received his first of two HAV vaccinations. (ECF No. 72 at 77; 73-2 at 23.)[12]

30. On April 9, 2008, plaintiff received his second HAV vaccination. (ECF No. 72 at 77; 73-2 at 24.)

31. On January 13, 2009, an abdominal and pelvis CT scan revealed a 6.6 x 8.4 cm mass on plaintiff's right hepatic lobe (liver), probably representing a hemangioma; a 2.1 cm left renal cyst near the superior pole; and a 1.5 cm gallstone. (ECF No. 72 at 77, 130.)

32. On February 4, 2009, plaintiff's PCP ordered a follow up CT scan in six months for plaintiff's liver mass. (ECF No. 73-2 at 27.)

33. Plaintiff transferred to HDSP on June 15, 2009.

34. Plaintiff testified that he continued to seek treatment for his liver pain from 2007 onward. (Pl. Dep. 22:17-23-9; 23:11-21; 24:1-12; 95:14-17.)

---

defendant Thomas in between receiving his HAV vaccines, told her he was in pain, and asked for advance or interferon treatment. (Pl.'s Dep. at 89.) But plaintiff also testified that defendant Thomas advised plaintiff that the interferon treatment was only for "those who are in the advanced stages of Hepatitis C or about to get liver failure." (Pl.'s Dep. at 88.)

[10] In her declaration, defendant Thomas states that "plaintiff should have scheduled a follow-up visit with [Thomas] on September 31, 2007. But plaintiff did not." (ECF No. 62-3 at 3.)

[11] On October 31, 2007, nonparty and LVN T. Molina completed a "Refusal of Examination and/or Treatment" form stating that plaintiff refused "Dr. line in regards to 1 month follow up." The form is not signed by plaintiff, and the box: "Patient refuses to sign" is not marked. (ECF No. 84 at 5.) On December 4, 2007, nonparty I. Reynoso completed a "Refusal of Examination and/or Treatment" form stating that plaintiff "refuse[d] doctors line," and checking the box: "Patient refuses to sign." (ECF No. 62-4 at 7.) The form was witnessed by C/O Paniagua. (Id.)

[12] Plaintiff declares that between October 18, 2007, through June 15, 2009, he was not called to medical for any follow up examination pertinent to his hepatitis diagnosis.

16

35.  On January 5, 2010, plaintiff submitted a health care request form claiming he had HCV and has been experiencing sharp pains on his upper back and entire right side of his back. (ECF No. 73-2 at 8.)  "I find it hard to function during the day and can't sleep at night, sometimes."  (Id.)

36.  On March 3, 2010, plaintiff was seen by nonparty Dr. Haffner, who noted plaintiff complained of "ongoing" right upper quadrant pain.  "It has been getting steadily more intense. He says that coughing and laughing bring this out."  (ECF No. 73-2 at 32.)

37.  On March 10, 2010, plaintiff was again tested for Hepatitis, and he was non-reactive to Hepatitis C.  (ECF No. 73-2 at 36.)

38.  As a result of his requests, plaintiff's gallbladder was removed, he underwent a liver embolization, and eventually his liver was resected.  (Pl. Dep. 54:4-16; 56:15-57:9; 59:7-14.)

39.  During his deposition, plaintiff admitted he is currently "completely pain free." (Pl. Dep. 61:1-13.)

40.  Plaintiff admits that he never asked defendant Thomas for the second set of test results.  (Pl. Dep. 97:22-24.)

41.  His main complaint against defendant Thomas is that "because of her, I didn't know that I had a tumor on my liver. Had I known that, I would have, you know, pursued that, you know, but the entire time I was thinking I had Hep C and it was a symptom from Hep C . . . . And it turned out it was negative . . . . I didn't even have Hepatitis C."  (Pl. Dep. 24:13-23; ECF No. 1 ¶ 17.)

42.  He also alleges that defendant Thomas "denied . . . interferon [treatment], the treatment for the hepatitis[, and] she didn't make me aware that newer test results were negative." (Pl. Dep. 101:24 - 102:1.)

43.  During his deposition, plaintiff admitted that no physician has ever told him that he definitely had a liver tumor in 2007.  (Pl. Dep. 96:21-25.)

44.  During his deposition, plaintiff stated he believed Thomas was negligent in not telling him he was HCV negative based upon the September 2007 laboratory reports.  (Pl. Dep. 24-25.)

////

Defendant Surian

1. Plaintiff transferred to HDSP on June 15, 2009.

2. Defendant Surian was employed as a utilization management nurse at HDSP from March 2008 to January 2013.

3. On April 21, 2010, plaintiff's physician submitted a request for special medical services for evaluation because plaintiff complained of pain in his liver. (ECF No. 1 at 6; ECF No. 63-4 at ¶ 4 (Surian Decl.).)

4. On April 22, 2010, the request for special medical services was denied by doctors at the secondary physician advisory level. (Id.)

5. Doctors decide whether an inmate's request for special medical services is granted or denied. (ECF No. 63-7 at 6 (Pl.'s Dep. 63:21-25); ECF No. 63-4 at ¶ 3.)

6. Defendant Surian signed an interdisciplinary progress note documenting the doctors' decision to deny the request for special services. (ECF Nos. 1 at 6; 63-4 at ¶ 4.)

7. Plaintiff has never met defendant Surian. (ECF No. 63- at 4-6; Pl.'s Dep. 63:4-7.)

8. Plaintiff named Surian as a defendant in this lawsuit because her name is on a single medical record. (ECF No. 63- at 4-6; Pl.'s Dep. 63:4-11.)

9. Defendant Surian has never provided medical treatment to plaintiff.

10. Defendant Surian's sole involvement with plaintiff's medical care was documenting the physicians' denial of plaintiff's request for special medical services. (Pl.'s Dep. 63; ECF No. 63-4 at ¶ 5.)

Defendants Guerra and Wilson

1. On January 13, 2009, while plaintiff was a patient in an outside hospital due to an unrelated injury, an abdominal and pelvis CT scan revealed a 6.6 x 8.4 cm mass on plaintiff's right hepatic lobe (liver), probably representing a hemangioma; a 2.1 cm left renal cyst near the superior pole; and a 1.5 cm gallstone. (ECF No. 72 at 130.)

2. On March 17, 2010, while housed at HDSP, an MRI of plaintiff's abdomen (without contrast) was performed; the impression was: (1) a large mass within the posterior segment of the right hepatic lobe correlates with a benign hemangioma; and (2) there is a small cyst within the

left kidney.  (ECF No. 72 at 140.)

3.  On June 2, 2011, plaintiff transferred to CCI.

4.  On June 25, 2013, a second MRI of plaintiff's abdomen, with and without contrast, was performed.  (ECF No. 72 at 155.)  The impressions were:  (1) There is a 10-cm lesion (10.6 x 7.9 x 5.1 cm) in the right lobe liver, with behavior consistent with a large benign hepatic hemangioma.  No concerning lesions are seen; (2) There is a large gallstone (4.1 cm) filling much of the gallbladder.  No MR evidence of acute cholecystitis.  No bile duct dilation; (3) Benign renal cysts (2.3 cm cyst from proximal left kidney; separate tiny left renal cyst).  (Id.)

5.  Defendant Guerra is a Registered Nurse employed at CCI from 2003 to 2016.

6.  Defendant Wilson is a Physician's Assistant employed at CCI since 2014.

7.  Specifically, from October 2013 to September 2014, defendant Guerra was the nurse who reviewed, assessed, and triaged plaintiff when he submitted a request for health care service.  (ECF No. 63-5 at ¶ 3.)  Defendant Guerra also scheduled and coordinated plaintiff's liver surgery.  (Id.)

8.  Defendant Guerra was aware that plaintiff was previously diagnosed with a liver hemangioma.  (ECF No. 63-5 at ¶ 3.)

9.  On October 2, 2013, at his appointment with Dr. Vu, plaintiff complained of right upper quadrant pain for one year, and attributed the pain to his liver, not the gallstone.  (ECF No. 72 at 170.)  Dr. Vu continued plaintiff's Tylenol #3 prescription (2 tabs daily) and advised plaintiff that if the pain does not improve after the cholecystectomy, hemangioma excision could be considered.  (Id.)

10.  On October 22, 2013, plaintiff submitted a Health Care Service Request Form to request a health care service appointment.  (ECF Nos. 1 at 9, 63-5 at ¶ 4; ECF No. 72 at 100.)  Plaintiff's reason was:  "F/U:  Dr. Vu, I'm in pain and have been having trouble sleeping.  Please see me as soon as possible.  Thank you."  (ECF Nos. 63-5 at 6; 72 at 100.)  Defendant Guerra triaged the form on October 23, 2013, and wrote that plaintiff has Tylenol #3 for pain, "Does not want to see RN, wants to see M.D.  Consulted with Dr. Vu, no orders given.  Refusal signed."  (ECF Nos. 63-5 at 6; 72 at 100.)

11. On October 23, 2013, defendant Guerra informed plaintiff that he was or would be scheduled to see a doctor in ten to fourteen days. (ECF No. 1 at 9; Pl.'s Dep. 62:12-20 (ECF No. 63-7 at 5); ECF No. 63-5 at ¶ 4.)

12. A "Refusal of Examination and/or Treatment form CDC 7225, dated October 27, 2013, bearing plaintiff's name and date of birth, is marked "Nurses Line," and states that plaintiff "wants to see Dr. Vu, RN will ducat patient for routine MD visit 10 to 14 days." (ECF No. 63-5 at 10.) The box beside "patient refuses to sign" is marked, and the form is witnessed by defendant Guerra on October 23, 2013, and a D. Stephen on October 27, 2013. (Id.)

13. On October 23, 2013, plaintiff submitted another Health Care Service Request Form to request a health care service appointment. (ECF Nos. 1 at 9, 63-5 at ¶ 4.) Plaintiff's reason: "I am in pain and have trouble sleeping. The pain also interferes with my daily functions. I'm currently on pain management for my medical condition. This qualifies as "follow-up" and need to see my PCP as soon as possible. The pain scale is 8.5. Thank you." (ECF No. 63-5 at 8.) On October 24, 2013, defendant Guerra triaged the request. (Id.) She noted plaintiff complained of liver pain for "years," mass is growing. Last saw MD 3-4 weeks ago. Tylenol #3 is not helping. Plaintiff's pain was described as radiating to back; right upper quad, 8 out of 10; Tylenol with codeine helping very little; has sharp, poking pain. Guerra wrote follow up with doctor as planned, noting plaintiff has "MDE next week 11/1/13 as previously notified to patient." (ECF No. 63-5 at 8.)

14. Defendant Guerra told plaintiff that he is required to pay a co-payment when he requests health care services, and plaintiff agreed to pay the co-payment. (ECF Nos. 1 at 9; 63-5 at ¶ 6; Pl.'s Dep., 62:12-13 & 63:1-3 (ECF No. 63-7 at 6).)[13]

15. On November 14, 2013, plaintiff underwent a laparoscopic cholecystectomy and hepatic biopsy; the postoperative diagnosis was chronic cholecystitis and hepatic lesions. (ECF No. 72 at 174.)

---

[13] Defendants also refer to plaintiff's response to defendant Guerra's First Set of Interrogatories, No. 3, but only the interrogatory No. 3 was provided, no response. (ECF No. 63-7 at 10.) The trust account statement reflecting medical copays by plaintiff only refers to 2014 copays. (ECF No. 63-5 at 14.)

16.  On March 26, 2014, a CT scan of plaintiff's abdomen and pelvis, without contrast, was performed at CCI; a 10.4 x 8.4 cm hepatic mass and a 2.5 cm left renal cyst were present. (ECF No. 72 at 192.)

17.  On April 15, 2014, a CT of plaintiff's abdomen, with and without contrast, and pelvis with contrast, were performed; in addition to a small left renal cyst, a large hemangioma of the liver, measuring 10.1 x 6.1 x 9.4 cm was noted.  (ECF No. 72 at 193.)

18.  On May 5, 2014, plaintiff submitted a health care request form asking Dr. Vu to renew plaintiff's prescription, which he was told expired the next day.  (ECF No. 72 at 103.)

19.  On May 6, 2014, Dr. Solomon, Riverside County Regional Medical Center, explained the risks of surgery vs. embolization, and recommended embolization.  (ECF No. 72 at 196.)

20.  On May 7, 2014, plaintiff submitted a health care request form alleging his pain medications expired and asked Dr. Vu to renew.  (ECF No. 72 at 104.)  On May 8, 2014, defendant Guerra marked the form "done."  (Id.)

21.  On May 8, 2014, plaintiff submitted another health care request form stating he is in pain and needs to see the doctor.  (ECF No. 72 at 105.)  On May 12, 2014, defendant Guerra noted "refusal signed, wants to see M.D.  [Plaintiff] has appointment May 14, 2014."  (Id.)

22.  On May 12, 2014, plaintiff signed a refusal of examination or treatment form, and his appointment with doctor on May 14 is noted.  (ECF No. 72 at 197.)

23.  On May 16, 2014, plaintiff filed a health care request form asking why his current pain regimen was reduced to twice a day from three times a day.  (ECF No. 72 at 106.)  Plaintiff states the three times a day was "barely getting him by."  (Id.)  On May 19, 2014, RN C. Rice responded that plaintiff's medication was not changed; that the prescription remains at three times per day.  (Id.)

24.  On May 18, 2014, plaintiff filed a 602 appeal stating his Tylenol 3 was prescribed three times a day until May 16, 2014, but was reduced to twice a day without consultation as to plaintiff's pain.  (ECF No. 72 at 202.)  Plaintiff alleged he suffers throbbing and sharp pains which have significantly increased, and called his condition "severely painful."  (ECF No. 72 at 203.)

25. On June 13, 2014, the first level appeal response states that defendant Wilson confirmed plaintiff's Tylenol #3 prescription remained at three times per day regimen and had not been changed. (ECF No. 72 at 204.) In his request for second level review, plaintiff reiterated that he was not receiving the medication three times per day. (ECF No. 72 at 205.)

26. Plaintiff had liver embolization on July 23, 2014. (ECF Nos. 1 at 9; 63-6 at ¶ 3.) Dr. Omar Saleh recommended plaintiff be prescribed morphine. (ECF No. 72 at 207.)

27. Defendant Wilson prescribed morphine for plaintiff on July 23, 2014, following his liver embolization procedure. (Pl.'s Dep. 57:17-23 (ECF No. 63-7 at 4); ECF No. 63-6 at ¶ 4; 11.)

28. On August 3, 2014, plaintiff submitted a health care request form advising that he went to see defendant Wilson on July 30, and pain meds were re-ordered three times a day, but plaintiff has only been getting them twice a day, and asked defendant Guerra to look into it. (ECF No. 72 at 108.) On August 4, 2014, defendant Guerra notified plaintiff that his Morphine was being tapered down and would expire on August 5, 2014. (ECF No. 72 at 108.)

29. Plaintiff's morphine prescription expired on August 4, 2014. (ECF Nos. 1 at 10; 63-5 at ¶ 8; 63-6 at ¶ 5.)[14] Thus, plaintiff received morphine from July 24 to August 4, 2014.

30. On August 5, 2014, plaintiff submitted a health care request form advising that he was notified that his morning dose of morphine was his last, sought clarification of the expiration date, and asked to see the doctor. (ECF Nos. 63-5 at 16; 72 at 109.) In triaging the health care request form on August 5, 2014, defendant Guerra wrote plaintiff was notified that his morphine stopped on August 5, 2014, and that plaintiff was scheduled for a routine appointment with his primary care doctor. (ECF No. 63-5 at 16.) No date for the follow up appointment was provided on the form. (Id.)

---

[14] Plaintiff's medication administration record confirms that plaintiff was initially prescribed morphine on July 24, 2014, for seven days, three times a day. (ECF No. 63-6 at 9) On July 30, 2014, the morphine was extended for three days, and on July 31, 2014, extended for two more days, expiring on August 4, 2014. (ECF No. 63-6 at 6-9.) Plaintiff received three pills a day through July 31, and then tapered from two pills a day to one pill a day. (ECF No. 63-6 at 6-8.)

31.  Plaintiff complained of pain to defendant Guerra.  (ECF Nos. 1 at 10; 63-5 at ¶ 8.)[15]

32.  Defendant Nurse Guerra did not and could not prescribe morphine to plaintiff.  (ECF Nos. 1 at 10; 63-5 at ¶ 8.)

33.  On August 6, 2014, plaintiff completed another health care request form:  "Request to see the doctor for pain management.  Pain has been increasing since being tapered down and more so since being cut off.  It's affected my sleep and daily program."  (ECF No. 63-5 at 18.)  In response, on August 7, 2014, defendant Guerra charted that plaintiff

> wants to see MD for pain management, [complains of] pain to right upper quadrant (liver) since embolization 2 wks ago. . . .  "poking pain," intermittent, 0 helps. . . . history of liver mass x 7 years.  Pain to right upper back, and right upper quadrant. . . .

(ECF No. 63-5 at 18.)  Plan noted as "consult with PA [illegible] regarding [plaintiff's] request for pain meds.  Has pending MD appointment < 14 days."  (Id.)

34.  On August 11, 2014, plaintiff filed a health care request form requesting

> "pain relief.  I can't sleep, I can't program.  The acetaminophen prescribed does nothing!  RN Guerra had just [given] me a lesson on how bad acetaminophen is for my liver especially with my already compromised state yet I'm prescribed exactly that.  I'm not healed, it hurts."

(ECF No. 72 at 111.)  On August 13, 2014, defendant Guerra noted that plaintiff was seen by RN on August 7, 2014, for same issue and has follow up with doctor on August 28, 2014.  (Id.)  Guerra charted that plaintiff wanted to keep his appointment with the doctor.  (Id.)

35.  On August 11, 2014, plaintiff filed a 602 appeal, stating his pain medication was tapered down and discontinued on August 4, 2014, the pain started to increase and has returned fully yet medical staff is aware and intentionally ignores plaintiff's pain.  (ECF No. 72 at 210, 219.)  Plaintiff claimed he suffered moderate to severe pain on a daily basis.  (ECF No. 72 at 219.)

36.  On August 20, 2014, plaintiff submitted a health care services request form stating:

---

[15]  Defendant Guerra declares that plaintiff requested morphine.  (ECF No. 63-5 at ¶ 8.) However, the health care request forms only note plaintiff's pain complaints; he does not ask for morphine in the written requests.

"If I'm in pain, why won't you do what you took an oath to do? You know of my pain well. You know what my condition is." (ECF No. 72 at 112.) On August 22, 2014, defendant Guerra marked box "See Nursing Encounter Form," which is not provided. (Id.)

37. On August 26, 2014, defendant Wilson interviewed plaintiff. (ECF No. 63-6 at ¶ 5.)[16] The chronic care provider progress note states that plaintiff

> states he is still in constant pain. "The pain is in my liver, and it always bothers me." He states the Tylenol 325, he is currently on, is ineffective. [Plaintiff] wants the Morphine returned or says he will settle for Tylenol 3.

(ECF Nos. 63-6 at 13, 72 at 223.)[17]

38. On September 23, 2014, plaintiff had routine follow up appointment with defendant Wilson. (ECF No. 72 at 225.) Plaintiff "reports persistent [right upper quadrant] pain, 8/10, comes intermittently, more strong in the evening. Described as a throbby, sharp pain. . . . nothing helps the pain to get better. . . . The pain is currently managed with Tylenol 325 2 pills TID prn. [Plaintiff] requesting stronger narcotic pain medication." (ECF No. 72 at 225.) Following examination, defendant Wilson opined, "[t]here remains no objective findings to warrant narcotic

---

[16] Plaintiff provided a copy of a first level appeal response that noted defendant Wilson interviewed plaintiff on August 26, 2014, in connection with appeal CCI HC 14036405. (ECF No. 72 at 210.) Defendants also cite to Burnley Decl. Ex. S, Pl.'s Resp. to Def. Wilson's First Set of Interrog. No. 1, but did not provide plaintiff's continuation page 3-A. (ECF No. 63-7 at 12.) In the response provided, plaintiff claims that the embolization failed and increased plaintiff's pain levels, for which he suffered severe pain for about three more months. (Id.)

[17] The note also states that plaintiff "was previously on Morphine before the surgery." Id. However, plaintiff declares that he was not prescribed Morphine prior to the surgery and did not receive morphine at the prison until July 23, 2014. (ECF No. 72 at 89.) In his declaration, defendant Wilson states that he advised plaintiff to take Tylenol No. 3 three times a day for pain management. (ECF No. 63-6 at 3.) However, the progress note does not reflect Tylenol No. 3 was prescribed despite plaintiff's alleged agreement to take it. (ECF No. 72 at 223.) Moreover, the medication administration record referred to by defendant Wilson does not reflect a prescription for Tylenol No. 3. (ECF No. 63-6 at 6-9.) Finally, in the August 28, 2014 first level appeal response, Dr. Baniga stated that on August 26, 2014, defendant Wilson reviewed plaintiff's case history, assessed plaintiff's medical condition, and determined it was not medically necessary for plaintiff to receive a stronger pain medication. (ECF No. 72 at 210.) Thus, the record does not demonstrate that plaintiff was prescribed Tylenol No. 3 on August 26, 2014, despite defendant Wilson's declaration to the contrary.

24

medication at this time. Tylenol is renewed." (ECF No. 72 at 225.)

39. On October 18, 2014, plaintiff received an abdomen CT without and with contrast, reflecting multiple hypoattenuating lesions in the left kidney likely representing cysts, and a large hemangioma occupying the majority of segment 7 of the liver with no significant interval change in size and minimal change in enhancement from prior exam. (ECF No. 72 at 241-42.) Dr. Levi Dansby stated that if plaintiff "continues to experience pain, repeat embolization is necessary." (ECF No. 72 at 242.)

40. On October 21, 2014, Dr. Solomon examined plaintiff and noted that he "still has chronic right flank and right shoulder pain." (ECF No. 72 at 243.) Dr. Solomon recommended plaintiff receive morphine 15 mg tablets daily for pain. (Id.) In addition, Dr. Solomon noted that the embolization attempt was not successful in controlling pain. Will discuss with interventional radiologist ("IR") if repeat is beneficial, if not, will plan on surgical resection." (ECF No. 72 at 243.)

41. On October 27, 2014, plaintiff submitted a health care services request form stating he would like to see defendant Wilson "asap" because he was still experiencing pain in the afternoon to night time. (ECF No. 72 at 115.) On October 28, 2014, RN Salzman noted plaintiff's pain in right lateral rib area, 5 on scale of 10; pain management not adequate; pain sharp, throbbing, non-radiating; can't sleep or function; chronic med problem, tumor benign. "Angry because MD denied him more morphine." (Id.)

42. On November 12, 2014, plaintiff presented for follow up complaining that he needs something for pain during the day. He was examined by defendant Wilson who noted plaintiff presently received Morphine 15 mg IR am and pm for pain, but added one 325 mg Tylenol pill during the day as needed in between Morphine doses. (ECF No. 72 at 244.)

43. On November 18, 2014, Dr. Solomon examined plaintiff for post-liver embolization follow-up. (ECF No. 72 at 245.) Plaintiff's symptoms were noted as unchanged since the July 23, 2014 procedure, and described "a constant dull throbbing pain that sometimes increases in intensity to the point where it immobilizes him." (Id.) Dr. Solomon noted that plaintiff needs liver resection because the prior embolization did not work to manage symptoms. (ECF No. 72 at

246.)

44. On November 19, 2014, defendant Wilson signed a physician request for services noting "failed liver embolization attempt. A surgical evaluation now recommends partial liver resection in order to resolve the lesion." (ECF No. 63-6 at 15.) The request was approved on November 20, 2019. (Id.)

45. On November 30, 2014, plaintiff submitted a health care services request form alleging that the Tylenol defendant Wilson prescribed does not help with the pain. (ECF No. 72 at 116.) Plaintiff stated he was still experiencing a lot of pain through most of the day, and that the Tylenol only gave him stomach aches. (Id.) "I know you don't believe me as you think I'm healed, but this pain is no joke! It randomly intensifies and it's so severe I'm unable to move. Please help. Thank you kindly." (Id.) On December 2, 2014, defendant Guerra wrote "seen 12/2/14 by M.D." (Id.)

46. On December 19, 2014, in the third level appeal response, it was noted that plaintiff's medication profile showed active orders for the pain medication morphine. (ECF No. 72 at 208.)

47. On January 12, 2015, plaintiff had a partial hepatectomy (liver resection). (Wilson Decl. ¶ 3; Pl.'s Dep. 59:10-15 (ECF No. 63-7 at 5); ECF No. 72 at 264.) A portion of plaintiff's liver, measuring 12 x 10 x 4.5 cm, and weighing 243 grams was removed. (ECF No. 72 at 264.) A hemorrhagic tumor was within the removed portion of the liver extending through the resected segment, measuring 12 x 9 x 3 cm. (Id.)

48. On January 30, 2015, plaintiff was seen for follow up by defendant Wilson, who noted plaintiff had post op surgical follow up on January 27, 2015. (ECF No. 72 at 266.) Wilson ordered continued pain management. (Id.)

49. On February 17, 2015, plaintiff was seen by defendant Wilson for follow up. (ECF No. 72 at 268.) Plaintiff reported minimal pain. (Id.)

50. On February 18, 2015, plaintiff presented to defendant Wilson to discuss the morphine taper. (ECF No. 63-6 at 17.) Plaintiff reported his pain "currently well-controlled." (Id.) Plaintiff "expressed fear of narcotic withdrawal" when morphine taper to end on March 9, and sought a brief trial of Tylenol No. 3 following end of morphine taper. (Id.) Defendant

Wilson prescribed one month of Tylenol No. 3 for pain as needed to begin March 10, 2015, after morphine stopped.  (Id., ECF No. 63-6 at 22.)

51.  On March 9, 2015, defendant Wilson prescribed plaintiff Tylenol No. 3 with an expiration date of April 10, 2015.  (ECF no. 63-6 at 20.)

52.  In March of 2015, plaintiff was transferred to Corcoran, on a layover en route to Pelican Bay.  (Pl.'s Dep. at 60.) (ECF No. 63-7 at 5.)

53.  On April 15, 2015, plaintiff was prescribed Tylenol No. 3 for seven days.  (ECF No. 63-6 at 19.)

54.  Plaintiff is no longer in pain.  (Pl.'s Dep. 61:12-1 (ECF No. 63-7 at 5).)

**ANALYSIS**

As noted above, defendants contend they are not liable for deliberate indifference to plaintiff's medical needs.  For the reasons discussed below, the court concludes that defendants Thomas and Surian are entitled to summary judgment on the merits of plaintiff's Eighth Amendment claims, but that defendants Guerra and Wilson are not.  In light of these findings, the court declines to reach defendant Thomas' alternative arguments based on exhaustion of administrative remedies and qualified immunity.

I.  Defendant Thomas

    A.  The Parties' Positions

In her motion, defendant Thomas argues that the undisputed facts demonstrate that plaintiff tested positive for HBV and HCV on July 18, 2007, but that a later test confirmed he was not chronically-infected with HCV.  The second test did not mean plaintiff was HCV negative in September of 2007; rather, the second test indicated that plaintiff's viral load was "not detected" under the lab's assay.  Defendant argues that any failure to inform plaintiff that he was HCV negative does not constitute deliberate indifference because plaintiff was not HCV negative in 2007, which was the only year in which defendant Thomas provided plaintiff medical care.

Further, defendant Thomas contends she was not deliberately indifferent for failing to order interferon treatment for plaintiff's HCV because he was not eligible for such treatment under CDCR's California Correctional Health Care Services Care Guide.  Under the pertinent

guidelines, once she learned plaintiff tested positive for HCV, defendant Thomas was required to order an HCV genotype and assess his eligibility for treatment, which she did.  Because the subsequent HCV RNA test indicated that HCV was "not detected," plaintiff was deemed "unlikely to be chronically HCV infected," and was therefore ineligible for HCV treatment. Defendant Thomas could not offer further HCV treatment under CDCR policy.

Finally, defendant Thomas argues that because there was no evidence that plaintiff had a mass or tumor on his liver in 2007, and plaintiff was not chronically infected with HCV, plaintiff did not suffer from a serious medical need, failing the objective prong of the deliberate indifference standard, and cannot demonstrate defendant Thomas acted with a sufficiently culpable state of mind when she informed plaintiff that he was HCV positive, as suggested by the first lab test, or when she allegedly denied his request for interferon treatment, which he was medically not entitled to receive.

In opposition, plaintiff argues that he complained of pain to defendant Thomas on multiple occasions, and that she should have ordered HCV treatment and additional tests, including a biopsy to determine the severity of the initial positive Hepatitis results, as well as other tests such as ultrasound scanning (CT) (MRI), once the second test demonstrated that plaintiff did not have chronic HCV, to determine the etiology of plaintiff's pain.  (ECF No. 73 at 24, 30.)  Plaintiff appears to contend that the two hepatitis test results were inconsistent and required additional testing.  (ECF No. 73 at 25.)  Plaintiff claims that defendant Thomas failed to inform plaintiff that a second series of tests confirmed he was HCV negative, and if he had known he was HCV negative, he would have sought additional treatment, and his liver mass would have been earlier discovered.  Plaintiff claims he earlier described his pain symptoms to an unidentified MTA, who suggested it could be hepatitis, which is what prompted plaintiff to ask for hepatitis testing.  (ECF No. 73 at 27, 29.)  Plaintiff contends that the declarations by his brother, George Ramirez, and his sister, Luz Estella Ramirez support his claims against defendant Thomas.

Further, plaintiff argues that subsequent tests performed in 2009, 2010, 2013 and 2014 support his claim that he complained to defendant Thomas about plaintiff's pain, suggesting she

did not document his pain complaints "to hide her misdeeds." (ECF No. 73 at 20.) Plaintiff contends the evidence is adequate for a reasonable factfinder to conclude that the defendant knew plaintiff's pain could be caused by gallstones or other liver abnormalities rather than hepatitis, based on her professional knowledge concerning the differences in symptoms between HAV/HCV and HBV. (ECF No. 73 at 28.)[18] Indeed, plaintiff argues that "based on her professional judgment, [Thomas] knew about plaintiff's liver and gallbladder abnormalities and that she could have avoided the prolongation of plaintiff's pain and suffering." (ECF No. 73 at 35.)

In reply, defendant Thomas points out that it is undisputed that (1) plaintiff was tested to determine whether he was HAV, HBV, or HCV positive; (2) plaintiff tested positive for HBV and HCV antibodies on July 23, 2007; (3) Thomas told plaintiff he was HBV and HCV positive in August of 2007; (4) Thomas ordered additional tests in compliance with CDCR policy to decide if drug therapy was appropriate and to determine how well plaintiff's liver was functioning; (5) test results reflected plaintiff was not chronically infected with HCV; (6) plaintiff's other blood work was normal; (7) based on these results, plaintiff was not eligible for interferon treatment; (8) Thomas sent plaintiff a notification of these diagnostic results in September of 2007 indicating that the results were within normal limits; (9) Plaintiff continued to seek treatment for his liver pain; (10) as a result of his requests, plaintiff's gallbladder was removed, he underwent a liver embolization, and eventually had a liver resection; and (11) plaintiff is currently pain free. (ECF No. 83 at 4.) Defendant Thomas argues that these undisputed facts establish that defendant Thomas was not deliberately indifferent to plaintiff's medical needs, and no genuine issue of material fact precludes entry of summary judgment.

Defendant Thomas contend that plaintiff fails to establish that he had a serious medical need in 2007.

Moreover, defendant Thomas argues that even accepting as true plaintiff's assertions in

---

[18] Plaintiff also recounts various other lawsuits in which defendant Thomas was named as a defendant, but plaintiff fails to identify evidence from those cases relevant to his claims against her in this case. (ECF No. 73 at 19-20; 32-33.)

his opposition, the evidence fails to establish that defendant Thomas knew or should have known about plaintiff's condition or that she intentionally deprived plaintiff of adequate medical treatment. (ECF No. 83 at 5.) Defendant Thomas properly tested plaintiff for hepatitis, informed him of the results, and ran additional tests; defendant properly informed plaintiff he was not eligible for interferon treatment; and defendant sent plaintiff a notification about the second lab results, but plaintiff did not receive it. (Id.) Despite defendant Thomas' alleged failure to address plaintiff's pain by performing additional tests, plaintiff concedes he continued to seek medical treatment for his liver pain, and eventually subsequent tests confirmed plaintiff had a huge liver tumor and a gallstone. (ECF No. 83 at 6.) Defendant contends that plaintiff's opposition make pellucid that his allegations against defendant Thomas are based on her alleged misdiagnosis of HCV, her refusal to conduct other tests to determine if there was a different reason why the two hepatitis tests differed, and whether there was another cause for his underlying pain. Defendant Thomas argues that such allegations are insufficient as a matter of law. (ECF No. 83 at 6.)

B. Discussion

Initially, the court observes that the declaration of George Ramirez speaks to the time frames of April to November of 2008, and January to June of 2009, long after defendant Thomas' involvement in plaintiff's care. Moreover, the "declaration" of Luz Ramirez, while notarized, is not signed under penalty of perjury and therefore is not a formal declaration.

Based on the evidence defendant Thomas submitted on summary judgment, the undersigned finds that the defendant has borne her initial burden of demonstrating that there is no genuine issue of material fact with respect to the adequacy of the medical care she provided to plaintiff in connection with plaintiff's medical needs. Specifically, as detailed above, defendant's evidence in this case demonstrates that: (1) plaintiff was tested to determine whether he was HAV, HBV, or HCV positive; (2) plaintiff tested positive for HBV and HCV antibodies on July 23, 2007; (3) Thomas told plaintiff he was HBV and HCV positive in August of 2007; (4) Thomas ordered additional tests in compliance with CDCR policy to decide if drug therapy was appropriate and to determine how well plaintiff's liver was functioning; (5) test results reflected plaintiff was not chronically infected with HCV; (6) plaintiff's other blood work was normal; (7)

1   based on these results, plaintiff was not eligible for interferon treatment; (8) Thomas sent plaintiff

2   a notification of these diagnostic results in September of 2007 indicating that the results were

3   within normal limits; (9) Plaintiff continued to seek treatment for his liver pain; (10) as a result of

4   his requests, plaintiff's gallbladder was removed, he underwent a liver embolization, and

5   eventually had a liver resection; and (11) plaintiff is currently pain free.

6       Given the evidence submitted by defendant Thomas in support of the pending motion for

7   summary judgment, the burden shifts to plaintiff to establish the existence of a genuine issue of

8   material fact with respect to his inadequate medical care claim. The court has reviewed plaintiff's

9   verified complaint and his opposition to the pending motion. In considering defendants' motion

10  for summary judgment with respect to plaintiff's deliberate indifference claim, the court is

11  required to believe plaintiff's evidence and draw all reasonable inferences from the facts before

12  the court in his favor. Despite drawing all reasonable inferences from that evidence in plaintiff's

13  favor, the court finds that plaintiff has failed to submit sufficient evidence to create a genuine

14  issue of material fact with respect to his claim that defendant Thomas was deliberately indifferent

15  to plaintiff's serious medical needs.

16      In large part, plaintiff relies heavily on later-learned facts to support his claim that he told

17  defendant Thomas he had pain, and to impugn her medical treatment in 2007. However, he

18  adduces no evidence demonstrating that defendant Thomas was aware that plaintiff had a large

19  mass on his liver that contained a large tumor, or that he also had a gallstone. Plaintiff argues that

20  defendant knew plaintiff's pain could be caused by gallstones or other liver abnormalities rather

21  than hepatitis, based on her professional knowledge concerning the differences in symptoms

22  between HAV/HCV and HBV. (ECF No. 73 at 28.) However, such is not the governing

23  standard. For a prison official's response to a serious medical need to be deliberately indifferent,

24  the official must "'know[ ] of and disregard[ ] an excessive risk to inmate health.'" Peralta v.

25  Dillard, 744 F.3d 1076, 1082 (9th Cir. 2014) (en banc) (quoting Farmer, 511 U.S. at 837). "[T]he

26  official must both be aware of facts from which the inference could be drawn that a substantial

27  risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. Here,

28  it is undisputed that no one knew plaintiff had a mass on his liver in 2007. Thus, defendant

Thomas could not have known of any risks pertaining thereto.

To the extent that plaintiff continues to claim that defendant Thomas was deliberately indifferent to plaintiff's serious medical needs because she prescribed Tylenol, which is contraindicated in those patients with liver disease or abnormalities, plaintiff's claim fails because he has not demonstrated that defendant Thomas was aware of plaintiff's liver condition.

As for plaintiff's declared pain complaints, he provides no medical records or multiple health care requests in which he alleges that in 2007 he suffered severe pain to which defendant Thomas did not respond or failed to adequately treat. Rather, it appears that most of plaintiff's pain complaints were made verbally to defendant Thomas outside of a scheduled appointment or exam. Importantly, in the one and only physical exam on August 31, 2007, plaintiff's own written request does not articulate that he was in pain, let alone severe pain.

That said, on summary judgment the court must take plaintiff's declaration as true and find that plaintiff did complain to defendant Thomas about pain. Nevertheless, the record confirms that defendant Thomas did not deny plaintiff pain medication. Rather, plaintiff concedes that defendant Thomas told plaintiff to ask the MTA for Tylenol. Plaintiff acknowledges that in 2007, Tylenol was freely dispensed upon request. Moreover, in his deposition, plaintiff denied asking Thomas for pain medication every time he saw her: "I told her I was in pain and I wanted to get on interferon." (Pl.'s Dep. at 95.) In addition, plaintiff denied asking defendant Thomas for stronger pain medication because he wanted to be put on treatment for HCV. (Pl.'s Dep. at 101.) Therefore, this court finds that to the extent defendant Thomas did not address plaintiff's pain complaints in 2007, such allegations constitute a mere difference of opinion that do not constitute an Eighth Amendment violation. The record reflects that defendant Thomas was constrained from placing plaintiff on interferon by the CCHCS Care Guide. (ECF No. 62-3 at 40-44.)

Although plaintiff contends defendant Thomas should have ordered a liver biopsy after his first test concluded he was HCV positive, the CCHCS Care Guide states that under such circumstances the care provider should order HCV genotype if no prior result is available and assess for treatment eligibility (ECF No. 62-3 at 42), which is what defendant Thomas did.

Plaintiff also argues that defendant Thomas should have consulted with an appropriate specialist or ordered other tests after the two inconsistent hepatitis test results, but the CCHCS Care Guide provides otherwise. (ECF No. 62-3 at 42.) The Care Guide sets forth the following diagnostic criteria governing situations where a patient tests positive for HCV antibodies but negative for HCV viral load:

Resolved HCV (up to 20% of those infected)

Acute HCV with transient viral clearing

False positive HCV Ab (antibody)

(ECF No. 62-3 at 42.) The accompanying comment states: "Consider rechecking high sensitivity VL at 6-12 months to confirm that patient is not chronically infected." (Id.) The Care Guide does not suggest or require the health care provider to consult with a specialist or order additional diagnostic tests. (Id.) This evidence establishes that defendant Thomas followed CDCR protocol in addressing the two hepatitis test results. Plaintiff adduces no expert medical opinion to the contrary. Hutchinson, 838 F.2d at 390.

The record reflects that defendant Thomas sent plaintiff notification of the second hepatitis test results. Although it is unclear the actual date defendant Thomas sent the notification, and it appears that plaintiff did not receive these results, plaintiff fails to adduce evidence that defendant Thomas did not send the test results. Moreover, plaintiff concedes that he did not ask defendant Thomas for such test results.

Further, plaintiff declares that between October 18, 2007, through June 15, 2009, he was not called to medical for any follow up examination pertinent to his hepatitis diagnosis. But plaintiff adduces no evidence demonstrating that defendant Thomas was responsible for scheduling such follow-up, and does not provide health care request forms demonstrating he sought follow-up during this period. The record demonstrates that defendant Thomas ordered that plaintiff receive follow up on or before September 31, 2007 (ECF No. 62-3 ¶ 11), but had no additional communication with plaintiff after she sent the notification of test results in September of 2007 (id. ¶ 11.) Plaintiff declares that he spoke with defendant Thomas one last time on or about September/October 2007, at which time she asked if plaintiff was still experiencing pain in

33

his liver.  (ECF No. 72 at 77.)  Nevertheless, given that plaintiff's second test results reflected that he was not chronically infected with HCV, the failure to schedule a follow-up for hepatitis does not constitute deliberate indifference.  Moreover, it appears that plaintiff's HCV status did not change because on March 10, 2010, plaintiff was again non-reactive to Hepatitis C.  (ECF No. 73-2 at 36.)

Even if defendant Thomas' treatment of plaintiff could be deemed inadequate or ineffective, it could only be said to have risen to the level of negligence or medical malpractice but not the higher standard of deliberate indifference.  Of course, it is well established that "[m]ere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."  Broughton, 622 F.2d at 460 (citing Estelle, 429 U.S. at 105-06).  See also Toguchi, 391 F.3d at 1057 ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights.").

In sum, based on the evidence presented in connection with the pending motion for summary judgment, the court finds that no reasonable juror could conclude that defendant Thomas was deliberately indifferent to plaintiff's serious medical needs and therefore violated plaintiff's rights under the Eighth Amendment.  Accordingly, the undersigned recommends granting defendant Thomas' motion for summary judgment.

II.  Defendant Surian

The court now turns to defense counsel's argument that defendant R. Surian, an RN at HDSP, is entitled to summary judgment on plaintiff's Eighth Amendment deliberate indifference claim.  In the complaint, plaintiff alleges that defendant Surian denied an April 2010 physician request for services that would provide plaintiff with GI and Liver evaluations (which then were apparently delayed until 2013 or 2014).

Based on the evidence defendant Surian submitted on summary judgment, defendant has borne the initial burden of demonstrating that there is no genuine issue of material fact with respect to the adequacy of the medical care defendant Surian provided to plaintiff in connection with his medical needs.  Specifically, as detailed above, defendants' evidence in this case demonstrates that defendant Surian was a utilization management nurse who did not have the

authority, discretion, or medical training to make decisions about treatment for plaintiff's

gastrointestinal and liver conditions; Surian did not examine, treat, or provide medical care to

prisoners, and Surian was not responsible for plaintiff's medical care. (ECF No. 63-4 at 1, 2.)

Rather, Surian's responsibilities included documenting requests for special medical services

received from prisoner's medical care providers, and documenting whether such requests were

approved or denied at the secondary physicians' level. (ECF No. 63-4 at 1-2.) Plaintiff was

never defendant Surian's patient, and Surian's sole role in signing the April 22, 2010

interdisciplinary progress note was to document that the request for special services regarding

plaintiff's gastrointestinal and liver conditions was reviewed at the secondary physician advisory

level and denied. (ECF No. 63-4 at 2, 7.)

Given the evidence submitted by defendant Surian in support of the pending motion for

summary judgment, the burden shifts to plaintiff to establish the existence of a genuine issue of

material fact with respect to his inadequate medical care claim. Again, the court has reviewed

plaintiff's verified complaint, his opposition to defendants' pending motion, pertinent sections of

his deposition testimony, and his declaration. In considering defendants' motion for summary

judgment with respect to plaintiff's deliberate indifference claim, the court is required to believe

plaintiff's evidence and draw all reasonable inferences from the facts before the court in his favor.

Drawing all reasonable inferences from that evidence in plaintiff's favor, the court finds that

plaintiff has failed to submit sufficient evidence to create a genuine issue of material fact with

respect to his claim that defendant Surian was deliberately indifferent to his serious medical

needs.

Specifically, in his declaration, plaintiff concedes that the secondary physicians level

denied the special request for services, and that defendant Surian was a utilization management

nurse. Plaintiff concedes that he has never met defendant Surian. Plaintiff argues that defendant

Surian became aware of plaintiff's serious medical needs yet denied him the request. But

plaintiff adduced no evidence demonstrating that defendant Surian was responsible for providing

plaintiff medical care or had the authority to overrule the decision of the secondary physician

advisory level. Indeed, defendant Surian admits she does not have the medical training to do so,

even if she had the authority, which she does not. Plaintiff did not provide a utilization management nurse's job description demonstrating that defendant Surian had the authority to overrule the decision, or submit any other evidence rebutting defendant Surian's explanation of her job duties. Plaintiff submitted no evidence demonstrating that defendant Surian was otherwise involved in plaintiff's medical care after Surian signed the form on April 22, 2010. Absent evidence not presented here, defendant Surian's act in documenting the decision of the secondary physician advisory level does not constitute deliberate indifference.

Thus, the court finds that no reasonable juror could conclude that defendant Surian was deliberately indifferent to plaintiff's serious medical needs and therefore violated his rights under the Eighth Amendment. Accordingly, the undersigned recommends granting defendant Surian summary judgment.

III. Defendant Guerra: October 2013 Claim

Defense counsel also argues that defendant I. Guerra, an RN at CCI, is entitled to summary judgment on plaintiff's Eighth Amendment deliberate indifference claim. In the complaint, plaintiff alleges that defendant Guerra allegedly refused to see plaintiff on an urgent basis in October 2013, and allegedly refused to provide plaintiff with pain medication in August 2014.

As noted above, the parties dispute how frequently Guerra provided medical care to plaintiff at CCI. Defendant Guerra claims she provided care to plaintiff on a weekly basis. (ECF No. 63-5 at ¶ 3 (Guerra Decl.).) Plaintiff disputes such claim, stating that the evidence submitted by Guerra does not demonstrate she saw plaintiff weekly. (ECF No. 72 at 63.) Defendant Guerra declares that she saw plaintiff "regularly" in October of 2013. (ECF No 63-5 at 2.) In his deposition, plaintiff testified that it got to the point where he was a regular at the medical clinic, but without attribution to a specific time frame. (Pl.'s Dep. at 62.) Defendant Guerra denies she ever refused to provide medical attention to plaintiff. (ECF No. 63-5 at 2.)

October 2013 claim

Defendant Guerra claims that plaintiff "often" refused to attend his appointments at the medical clinic because he wanted to see a doctor rather than a nurse, and often complained about

the $5.00 copay.  Plaintiff claims defendant Guerra would send officers to plaintiff's cell door and tell plaintiff that defendant Guerra wanted plaintiff to sign this refusal slip indicating that he was scheduled to see the doctor in so many days, but plaintiff refused, stating he needed to see the doctor now.  (Pl.'s Dep. at 62 (ECF No. 63-7 at 6).)  Plaintiff claims the officer responded that Guerra would charge plaintiff for the visit.  (Id.)  In the complaint, plaintiff claims this happened on or about October 23, 2013, and that he "accepted" this outcome despite his belief that he should not be charged for the visit, but Guerra refused to see him.  (ECF No. 1 at 9.)  Plaintiff argues that the October 22 and 23, 2013 health care requests made defendant Guerra aware of plaintiff's need for urgent treatment, yet she prolonged plaintiff's pain for 10 to 14 more days or more.  (ECF No. 72 at 61.)  Plaintiff argues that despite her knowledge of plaintiff's 8.5 pain, defendant Guerra did not schedule a doctor's appointment as emergency or urgent, thus subjecting plaintiff to untreated pain.  (ECF No. 72 at 62.)

Plaintiff testified that he was having strong pain episodes at this time, to the point where his cell mate, Eleazar Gonzalez, would have to help plaintiff move or get up when officers came to the cell.  (Pl.'s Dep. at 61 (ECF No. 63-7 at 5).)  Plaintiff provided the declaration of Mr. Gonzalez, who confirmed he had to help plaintiff and also witnessed plaintiff's severe pain during the day and night, including his screams and moans during the night, and plaintiff holding his upper right abdominal area.  (ECF No. 72 at 288.)

In support of her motion, defendant Guerra provided the October 22 and 23, 2013 health care request forms and the refusal of exam form described above.  In her declaration, defendant Guerra points out that plaintiff was scheduled for an appointment with the doctor, but does not further explain her treatment of plaintiff on October 24, 2013.  She claims generally that if plaintiff was suffering an urgent need for medical care, all he had to do was alert custody staff and he would be escorted to the medical clinic for immediate attention.  Here, however, plaintiff was personally seen by defendant Guerra on October 24, so he did not need to otherwise alert custody staff.  Despite her inability to prescribe medication, defendant Guerra could have expedited plaintiff's appointment with the doctor in light of plaintiff's pain complaints.  A reasonable juror could find that where a patient presents with pain he characterizes as 8.5 on the

scale of 10, supported by plaintiff's cellmate's declaration, requiring plaintiff to wait from October 24, 2013, until his next doctor's appointment on November 1, 2013, could be characterized as deliberate indifference to plaintiff's need for pain medications. Although Guerra wrote that the appointment was "next week," the delay was a period of nine days, where plaintiff is incarcerated and unable to obtain additional pain medication in any other way. Also, plaintiff provides the declaration of inmate Kevin Hunt who confirms that in October and November of 2013, plaintiff attempted to get Mr. Hunt to give plaintiff Mr. Hunt's pain medication. (ECF No. 72 at 289-90.) Defendants did not provide a copy of the medical record from plaintiff's November 1, 2013 appointment to determine whether plaintiff was provided additional pain medication or whether the doctor determined no additional pain medications were required.

Based on the above, a triable issue of material fact exists on the question of whether defendant Guerra was deliberately indifferent to plaintiff's pain complaints in October of 2013 by failing to expedite plaintiff's appointment with Dr. Vu.

IV.  <u>Defendants Guerra and Wilson:  August to October 2014</u>

Defense counsel also argues that defendants I. Guerra, an RN at CCI, and Dr. R. Wilson, a CCI physician, are entitled to summary judgment on plaintiff's Eighth Amendment deliberate indifference claim. In the complaint, plaintiff alleges that defendants Guerra and Wilson allegedly refused to provide plaintiff with pain medication in August 2014.

<u>The Parties' Positions</u>

Following his liver embolization on July 23, 2014, and the expiration of his prescription for morphine on August 4, 2014, plaintiff alleges that defendant Guerra refused to provide plaintiff with pain medication in August 2014, and reportedly accused plaintiff of inappropriately seeking narcotics. Plaintiff also alleges that defendant Wilson refused to see plaintiff, which resulted in plaintiff not receiving pain medications. Plaintiff alleges that during the August 26, 2014 interview, defendant Wilson told plaintiff that there was nothing they could do about plaintiff's pain, and that the liver embolization "took plaintiff's pain away." (ECF No. 1 at 10.) Plaintiff objected that his pain was the same, and was stronger sometimes, but defendant Wilson denied plaintiff any pain treatment. (<u>Id.</u>)

Defendants Guerra and Wilson argue that plaintiff had a difference of opinion as to appropriate medical treatment which does not rise to the level of an Eighth Amendment violation. Defendant Guerra asserts that as an RN, she is unable to prescribe narcotics, and in response to plaintiff's request to see the doctor for pain management, scheduled plaintiff for such doctor's appointment. Defendant Guerra denies that she ever denied plaintiff medical care.

In opposition, plaintiff declares that on August 7, 2014, plaintiff described his pain symptoms to defendant Guerra and asked to speak to defendant Wilson, who was also there, and both said no. (ECF No. 72 at 88, ¶ 105.) Plaintiff declares that defendant Guerra accused plaintiff of only seeking narcotics. (ECF No. 72 at 88; 1 at ¶ 53.) Plaintiff provides the declaration of inmate Carlos Bernal who witnessed plaintiff in "severe pain," and pled with nurses to give him medical attention and ask why was his pain medication discontinued. (ECF No. 72 at 293-94.) Inmate Bernal declares this situation went on for about three months, during which time plaintiff was "hurting so bad," and Bernal heard plaintiff "moaning in pain." (Id.) Plaintiff provides the declaration of inmate Matta Santos who claims that from August 10 to October, 2014, he collected numerous health care request forms for plaintiff which Santos gave to LVN Feliciano on behalf of plaintiff. (ECF No. 72 at 295.) Plaintiff provided the declaration of inmate Thomas Hesse who declares that "on and around the month of September," plaintiff asked Hesse for Hesse's prescribed medication because plaintiff was in severe pain. (ECF No. 72 at 297.) Hesse observed plaintiff "whimpering." (Id.) Hesse claims he told Nurse Deluna that plaintiff was having a severe pain episode but that despite Deluna telling Hesse she would go see plaintiff, she did not. (Id.)

In reply, defendant Guerra contends that health care request forms are for non-urgent medical services, and plaintiff could have alerted custody staff members for escort to the medical clinic if he needed immediate attention. Because plaintiff's medical request form was directed to the doctor, and plaintiff confirms he sought to see a medical doctor about his liver pain, and defendant Guerra scheduled a medical appointment, her actions cannot be deemed deliberate indifference. Defendant Wilson argues that plaintiff has failed to show that defendant Wilson's chosen course of treatment was medically unacceptable or made in conscious disregard of an

excessive risk to plaintiff's health. (ECF No. 79 at 6.) In the alternative, both defendants seek qualified immunity.

Discussion

It is undisputed that plaintiff regularly complained of liver pain and requested to see the doctor for pain management. It is also undisputed that defendant Guerra, an RN, is unable to prescribe narcotics. The record reflects that plaintiff received morphine from July 24, 2014, until it expired on August 4, 2014.

In response to his health care request concerning the morphine prescription, defendant Guerra saw plaintiff, confirmed that his morphine prescription expired on August 5, 2014, and informed plaintiff that he was scheduled for a routine appointment with his primary doctor. (ECF No. 63-5 at 16.) The date of such appointment was not noted on the form. (Id.) On August 6, 2014, plaintiff completed a health care request form claiming his pain has been increasing since it was tapered down, and more so since the prescription expired. Plaintiff reported the pain affected his sleep and daily program. (ECF No. 63-5 at 18.) Defendant Guerra examined plaintiff and noted he wanted to see the doctor for pain management. Upon examination, defendant Guerra wrote "poking pain," intermittent. Guerra consulted with PA regarding plaintiff's request for pain meds and noted plaintiff's appointment with a doctor in less than 14 days. (ECF No. 63-5 at 18.) However, defendant Guerra provided no medical record from a doctor's appointment within 14 days of August 6, 2014; Guerra's note on plaintiff's August 11, 2014 request form states that plaintiff has a follow-up with a doctor on August 28, 2014. (ECF No. 72 at 111.) This is a period of 22 days, not a period less than 14 days.

The next medical record is from the August 26, 2014 "interview" which, rather than a follow-up medical appointment for plaintiff's request to see a doctor for pain management, was rather an interview for plaintiff's 602 appeal concerning the lack of pain medications. (ECF No. 63-6 at 13.) Plaintiff declares that he explained to defendant Wilson that the pain in plaintiff's liver was much stronger than before, but that defendant Wilson told plaintiff there was nothing they could do about the pain, that pain management would not be prescribed. (ECF No. 72 at 89-90.)

It is undisputed that plaintiff complained of pain in his liver. Indeed, the chronic care note states: "pt. states he is still in constant pain. 'The pain is in my liver, and it always bothers me.' ... He states the Tylenol 325, he is currently on, is ineffective. Pt. wants the morphine returned or says he will settle for Tylenol 3." (ECF No. 63-6 at 13.) Plaintiff was not provided additional pain medication; rather the acetaminophen was renewed. (ECF No. 72 at 89; 63-6 at 13.) On September 23, 2014, defendant Wilson again simply renewed the acetaminophen, despite plaintiff's complaint that it was ineffective to address his "throbby, sharp pain." (ECF No. 72 at 225.)

Although defendant Wilson declares that plaintiff also stated that his "pain was well controlled," such statement is listed, without a date attribution, under a subheading "Past Notes," that also includes the 7/23/2014 embolization and other undated notes (ECF No. 63-6 at 13), and therefore cannot be credited as plaintiff's current complaint. Defendant Wilson, a physician's assistant, found plaintiff was mobile, tolerating a regular diet, and producing regular stool, and determined that there was no medical need to prescribe narcotics for plaintiff. (Id.) Indeed, the Chronic Care Provider Progress Note states "there are no objective findings, or other medical indication to continue narcotics at this time." (ECF No. 63-6 at 13.) However, on October 21, 2014, Dr. Solomon noted plaintiff's chronic pain and recommended he be prescribed morphine, and it appears that plaintiff was then prescribed morphine until his liver resection on January 12, 2015, and after. In addition, plaintiff declares that Dr. Solomon expressed surprise that plaintiff's pain management was discontinued, and stated, "I know you're in pain." (ECF No. 72 at 91.)

Here, defendant Wilson opined that he believed plaintiff had developed a dependency on morphine because he had been taking morphine for an extended period of time, and claims long term use of morphine may cause unwanted side effects and often results in addiction, misuse and dependency. (ECF No. 63-6 at 2.) However, plaintiff adduced evidence that he had only taken morphine for 12 days, from July 24, 2014, to August 4, 2014, and did not take morphine prior to the July 23, 2014 embolization. In addition, unlike defendant Wilson's subsequent treatment of plaintiff in 2015, where Wilson provided Tylenol No. 3 to "gradually transition him to a less potent narcotic" (ECF No. 63-6 at 3) after an extended regimen of morphine was stopped,

defendant Wilson did not take such steps in July of 2014. Rather, plaintiff was only provided Tylenol 325 mg tabs, and the record does not reflect when he was first provided such tabs. Moreover, plaintiff submits declarations supporting his claims of pain from August to October of 2014, and demonstrating that both defendants Guerra and Wilson were aware of plaintiff's pain complaints.[19] Importantly, two different doctors, Dr. Saleh and Dr. Solomon, recommended that plaintiff be prescribed morphine for his pain. Following Dr. Solomon's recommendation, plaintiff continued receiving morphine until January 12, 2015, when it was tapered down, and plaintiff was provided Tylenol No. 3 until his pain abated.

Interestingly, on November 12, 2014, despite plaintiff's ongoing prescription for morphine, plaintiff presented to defendant Wilson complaining that he needed pain medications for the day, and defendant Wilson prescribed an additional tab of Tylenol No. 3 in between morphine doses. (ECF No. 72 at 244.) Defendant Wilson does not explain why plaintiff's pain complaints on November 12, 2014, were credited but not his pain complaints in August or September of 2014.

Defendants rely on Gonzales v. Ugwueze, 2014 WL 223506 at *9 (E.D. Cal. Jan. 21, 2014), subsequently aff'd, 594 F. App'x 448 (9th Cir. 2015), where the court found that a defendant doctor was not deliberately indifferent for prescribing Tylenol instead of opioid pain medication. (ECF No. 79 at 6.) However, in Gonzales, the prisoner had not previously been prescribed opioid pain medication, and none of the orthopedists had recommended additional or different pain medications. Here, plaintiff had previously been prescribed Tylenol No. 3 and morphine for pain, by three different doctors as well as by defendant Wilson. Moreover, in Gonzales, the prisoner was prescribed Tylenol 625 mg twice a day, as needed. During the period at issue here, plaintiff was prescribed 325 mg. of Tylenol, which he repeatedly claimed was ineffective.

A jury could find that defendants Guerra and Wilson merely had a difference of opinion as to the proper treatment for plaintiff's pain. However, in light of plaintiff's declaration, the inmate

---

[19] Indeed, in his first level appeal response, Dr. Baniga wrote that defendant "Wilson noted that CCI Medical staff is fully aware of [plaintiff's] complaint of pain." (ECF No. 72 at 210.)

declarations in support, and the fact that two outside doctors, Dr. Saleh and Dr. Solomon, both recommended that plaintiff be prescribed morphine for plaintiff's pain, a jury could also find that defendants Guerra and Wilson were deliberately indifferent to plaintiff's pain. Although defendant Guerra could not prescribe narcotics, she could have made an urgent or emergency medical appointment for plaintiff to see a doctor. Similarly, defendant Wilson could have scheduled an appointment for plaintiff to see a doctor, or could have prescribed Tylenol No. 3 to at least minimize plaintiff's pain. As discussed above, there are material disputes of fact as to the treatment plaintiff received for his pain by both defendants Guerra and Wilson.

In sum, based on the evidence presented in connection with the pending motion for summary judgment, the court finds there are material disputes of fact that preclude entry of summary judgment on behalf of defendants Guerra and Wilson. These same material disputes of fact also preclude an award of qualified immunity for either defendant. Accordingly, the undersigned recommends denying defendants Guerra and Wilson summary judgment.

## CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendant Thomas' motion for summary judgment (ECF No. 62) be granted;

2. Defendant Surian's motion for summary judgment (ECF No. 63) be granted;

3. Defendant Guerra's motion for summary judgment (ECF No. 63) be denied;

4. Defendant Wilson's motion for summary judgment (ECF No. 63) be denied; and

5. This action be referred back to the assigned magistrate judge for further scheduling.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The

////

////

parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  August 23, 2017

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/rami2079.msj.med